UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

CASE NO.: 24-10797
District Court Docket No.: 23-cv-24257-BB

---

BYRON CHEMALY,

Appellant/Cross-Appellee,

vs.

EDDIE LAMPERT, individually; GRANT GOLD, individually;
R. OPERATIONS, LTD., a foreign entity; FOUNTAINHEAD
MARINE LIMITED, a foreign entity; CAMPER & NICHOLSONS,
a Florida Corporation; and XL CATLIN SYNDICATE 2003, a
foreign insurer registered and authorized to do business in Florida,

Appellees/Cross-Appellants.

---

APPEAL TAKEN FROM
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

---

## APPELLANT/CROSS APPELLEE'S
## INITIAL BRIEF

---

Michael F. Guilford, Esq.
Michael F. Guilford, P.A.
*Counsel for Appellant/Cross-Appellee*
44 W. Flagler Street
Suite 750, Courthouse Tower
Miami, FL 33130
Tel. 305-539-1999
mfguilford@crewcounsel.com
Florida Bar No. 516066

PHILIP D. PARRISH, P.A.
*Counsel for Appellant/Cross Appellee*
7301 SW 57th Court, Suite 430
Miami, FL 33143
Tel. 305-670-5550
Fax: 305-670-5552
phil@parrishappeals.com
By: */s/ Philip D. Parrish*
     Philip D. Parrish
     Florida Bar No. 541877

# CERTIFICATE OF INTERESTED PERSONS

## TRIAL JUDGES:

Bloom, Beth, *United States District Judge*

Edwin G. Torres, *Ch. Magistrate Judge*

## ATTORNEYS:

Bushway, Brandon, *Counsel for Appellees/Cross-Appellants/Defendants*

Coizeau, Christina Renee, *Counsel for Appellees/ Cross-Appellants/Defendants*

Davant, Charles S., *Counsel for Appellees/ Cross-Appellants/Defendants*

Davant Law, P.A., *Counsel for Appellees/ Cross-Appellants/Defendants*

Dmiszewski, Aaron, *Counsel for Appellees/Cross-Appellants/Defendants*

Guilford, Michael F., *Counsel for Appellant/Cross-Appellee/Plaintiff*

Michael F. Guilford, P.A., *Counsel for Appellant/Cross-Appellee/Plaintiff*

Parrish, Philip D., *Counsel for Appellant/Cross-Appellee/Plaintiff*

Philip D. Parrish, P.A., *Counsel for Appellant/Cross-Appellee/Plaintiff*

## PARTIES:

Camper & Nicholsons, *Appellee/Cross-Appellant/Defendant*

Chemaly, Byron, *Appellant/Cross-Appellee/Plaintiff*

Fountainhead Marine Limited, *Appellee/Cross-Appellant/Defendant*

Gold, Grant, *Appellee/Cross-Appellant/Defendant*

R. Operations, LTD, *Appellee/Cross-Appellant/Defendant*

Lampert, Eddie, *Appellee/Cross-Appellant/Defendant*

XL Catlin Syndicate 2003, *Appellee/Cross-Appellant/Defendant*

*/s/ Philip D. Parrish*
Philip D. Parrish, Esq.
FBN: 541877

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant, Byron Chemaly, a Jones Act seaman, respectfully requests oral argument.   The Appellant believes that further discussion of the jurisdictional issues and merits issues in this appeal and cross appeal will benefit the Court.

## CERTIFICATE OF TYPE SIZE AND FONT

Undersigned counsel certifies that the size and style of type used in this brief is 14-point Times New Roman.

# TABLE OF CONTENTS

Contents                                                             Page

CERTIFICATE OF INTERESTED PERSONS .....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................... i

CERTIFICATE OF TYPE SIZE AND FONT ......................................................... i

TABLE OF CONTENTS........................................................................................ ii

TABLE OF AUTHORITIES ................................................................................. iv

STATEMENT OF JURISDICTION..........................................................................1

ISSUES PRESENTED: ...........................................................................................2

STATEMENT OF THE CASE AND FACTS .........................................................2

STANDARD OF REVIEW ...................................................................................11

SUMMARY OF THE ARGUMENT ....................................................................11

ARGUMENT ........................................................................................................14

     I. *GE ENERGY POWER CONVERSION FRANCE SAS CORP. v. OUTOKUMPU STAINLESS U.S., LLC*, 140 S.Ct. 1637 (2020) REQUIRES THIS COURT TO REVISIT ITS INTERPRETATION OF THE CONVENTION'S DEFINITION OF COMMERCIAL AND THE CONVENTION'S NULL AND VOID DEFENSE IN *BAUTISTA v. STAR CRUISES*, 396 F.3d 1289 (11th Cir. 2005) AND *LINDO v. NCL (BAHAMAS), LTD*, 652 F.3d 1257 (11th Cir. 2011)............................................14

     II. THE DISTRICT COURT ERRED BY COMPELLING ARBITRATION WHERE THERE IS NO VALID WRITTEN ARBITRATION AGREEMENT .......................................................41

III.   THE DISTRICT COURT ERRED BY RULING THAT THE NON-SIGNATORIES CAN APPLY EQUITABLE ESTOPPEL BECAUSE THE PLAINTIFF'S CLAIMS AGAINST THE NON-SIGNATORY PARTIES ARE BASED UPON THE BORROWED SERVANT DOCTRINE, NOT THE SEAFARER'S EMPLOYMENT CONTRACT AND THE PLAINTIFF'S CLAIMS DO NOT ALLEGE THE TYPE OF CONCERTED  CONDUCT NECESSARY FOR EQUITABLE ESTOPPEL..........................................................................48

CONCLUSION...........................................................................55

CERTIFICATE OF COMPLIANCE.......................................55

CERTIFICATE OF SERVICE ..............................................56

# TABLE OF AUTHORITIES

Page(s)

Cases

*Alvarez v. Uniroyal Tire Company*,
508 F.3d 639 (11th Cir. 2007)............................................................11

*Atlantic Sounding Co., Inc. v. Townsend*,
557 U.S. 404 (2009) ............................................................... 24, 37

*Bahamas Sales Associate, LLC v. Byers*,
701 F.3d 1335 (11th Cir. 2012)........................................... 49, 50, 51

*Bainbridge v. Merchants' & Miners' Transp. Co.*,
287 U.S. 278 (1932) .............................................................. 18, 32, 37

*Baker v. Raymond Int'l, Inc.*,
656 F.2d 173 (5th Cir. Unit A 1981)...................................................50

*Bautista v. Star Cruises*,
396 F.3d 1289 (11th Cir. 2005)................................................. passim

*Berkovich v. Casa Paradiso North, Inc.*,
125 So.3d 938 (Fla. 4th DCA 2013) ...................................................48

*Boyd v. Homes of Legend, Inc.*,
981 F.Supp. 1423 (M.D. Ala. 1997)....................................................54

*Boyle v. United Technologies Corporation*,
487 U.S. 500 (1988) .................................................................. 29, 30

*Calmar S.S. Corp. v. Taylor*,
303 U.S. 525 (1938) .........................................................................37

*Cappello v. Carnival Corp.*,
2012 WL 3291844 (S.D. Fla. 2012).....................................................53

*Castillo v. Spiliada Maritime Corp.*,
937 F.2d 240 (5th Cir. 1991)..............................................................38

*Cawthorn v. Auto-Owners Ins. Co.*,
   791 F.Appx. 60 (11th Cir. 2019) .........................................................45

*Chandris, Inc. v. Latsis*,
   515 U.S. 347 (1995) ................................................................... 37,38

*Circuit City Stores v. Adams*,
   532 US 105 (2000) .................................................................... 22, 28

*Collie v. Fergusson*,
   281 U.S. 52 (1930) ............................................................................38

*Cooper v. Meridian Yachts, Ltd.*,
   575 F.3d 1151 (11th Cir. 2009)........................................................53

*Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*,
   66 F.4th 876 (11th Cir. 2023)..........................................................20

*Cortes v. Baltimore Insular Lines*,
   287 U.S. 367 (1932) ............................................................. 18, 38, 50

*Cox v. Roth*,
   348 U.S. 207 (1955) ............................................................. 19, 32, 37

*Davis v. Valsamis, Inc.*,
   752 Fed.Appx. 688 (11th Cir. 2018) ...............................................45

*De Gracia v. Royal Caribbean Cruises Ltd.*,
   580 F.Supp.3d 1217 (S.D. Fla. 2022)..............................................47

*Dean Witter Reynolds Inc. v. Byrd*,
   470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) .......................22

*Doe v. Princess Cruise Lines, Ltd.*,
   657 F.3d 1204 (11th Cir. 2011).................................................8, 44

*Edward Leasing Corp. v. Uhlig & Assoc. Inc.*,
   785 F.2d 877 (11th Cir. 1986)..........................................................45

*Employers Ins. v. Bright Metal Specialties, Inc.*,
   251 F.3d 1316 (11th Cir. 2001).........................................................11

*Escobal v. Celebration Cruise Operator Inc.*,
    482 F.App'x 475 (11th Cir. 2012)....................................................... 8, 45, 46, 53

*Financial Advisors, Inc. v. Makarewicz*,
    122 F.3d 936 (11th Cir. 1997)...............................................................47

*First Options of Chicago Inc. v. Kaplan*,
    514 U.S. 938 (1995) ...........................................................................47

*Garay v. Carnival Cruise Line Inc.*,
    904 F.2d 1527 (11th Circuit 1990)..........................................................6

*Garrett v. Moore-McCormack Co.,*
    *Inc.*, 317 U.S. 239 (1942) ............................................................. passim

*GE Energy Power Conversion France SAS Corp. v. Outokumpu Stainless* ...............
    *U.S., LLC*, 140 S.Ct. 1637 (2020) .............................................. passim

*Green Tree Fin. Corporation- Alabama v. Randolph*,
    531 U.S. 79 (2000) .............................................................................27

*Guidry v. South Louisiana Contractors, Inc.,*
    614 F.2d 447 (5th Cir. 1980) ...............................................................51

*Hancock v. Brumer, Cohen, Logan, Kandell & Kaufman*,
    580 So.2d 782 (Fla. 3d DCA 1991)........................................................47

*Harden v. Gordon,*
    11 F.Cas. 480 (D. Maine 1823) .............................................. 24, 37, 39

*Howsam v. Dean Witter Reynolds*,
    537 U.S. 79 (2002) .............................................................................40

*Hurtado v. Balerno Int'l Ltd.*,
    2019 WL 8160701 (S.D. Fla. 2019)........................................................52

*Ingle v. Circuit City Stores,*
    328 F.3d 1165 (9th Cir. 2003) .............................................................35

InterGen N.V. v. Grina,
    344 F.3d 134 (1st Cir. 2003) ...............................................................29

*Isbrandtson Co. v. Johnson*,
  343 U.S. 779 (1952) ......................................................................37

*Jacob v. New York City*,
  315 U.S. 752 (1942) ......................................................................33

*Johns v. Taramita,*
  *Inc.*, 132 F.Supp.2d 1021 (S.D. Fla. 2001)...............................47

*Kernan v. American Dredging Co.*,
  355 U.S. 426 (1958) ............................................................ 18, 32

*Lindo v. NCL (Bahamas), LTD*,
  652 F.3d 1257 (11th Cir. 2011)...................................... passim

*M/S Bremen v. Zapata Off-Shore Co.*,
  407 U.S. 1 (1972) ................................................................. 36, 37

*McNamara v. Geico*,
  30 F.4th 1055 (11th Cir. 2022)....................................................45

*Miles v. Apex Marine Corp.*,
  498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990) ..........29

*Mitsubishi Motor Corp. v. Soler Chrysler Plymouth, Inc.,*
  473 U.S. 614 (1985) ...................................................... 27, 29, 36

*Moragne v. States Marine Lines, Inc.,*
  398 U.S. 375 (1970) ............................................................. 24, 37

*Morgan v. Sundance, Inc.,*
  142 S.Ct. 1708 (2022) ......................................................... passim

*MS Dealer Service Corp. v Franklin*,
  177 F.3d 942 (11th Cir. 1999)......................................................54

*New Prime, Inc. v. Oliveria,*
  139 S.Ct. 532 (2019)........................................................... 27, 28

*New v. Sports and Recreation*,
  114 F.3d 1092 (11th Cir. 1997)....................................................11

*Norfolk So. Ry. Co. v. Sorrell*,
  549 U.S. 158 (2007) ................................................................... 19, 32

*O'Donnell v. Great Lakes Dredge & Dock Co.*,
  318 U.S. 36 (1943) ...............................................................................37

*Outokumpu Stainless U.S., LLC v. Coverteam SAS*,
  2022 WL 2643936 (11th Cir. 2022) ........................................... 9, 28, 29

*Panama R. Co. v. Johnson*,
  264 U.S. 375 (1924) ...............................................................................30

*Pennington v. Pac. Coast Transp. Co.*,
  419 F.2d 122 (5th Cir. 1969) ..................................................................50

*Phil., Balt. & Wash. RR Co. v. Schubert*,
  224 U.S. 603 (1912) ................................................................... 19, 32

*Pineda v. Oceania Cruises, Inc.*,
  283 F.Supp.3d 1307 (S.D. Fla. 2017).....................................................53

*Prima Paint Corp. v. Flood and Conklin Mfg. Co.*,
  388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) .......................22

*Reed v. Royal Caribbean Cruises Ltd.*,
  2021 WL 4307048 (S.D. Fla. 2021)........................................................48

*Reed v. Steamship Yaka*,
  373 U.S. 410 (1963) ................................................................... 39, 50

*Romero v. International Terminal Operating Co.*,
  358 U.S. 354 (1959) ...............................................................................30

*Rozanska v. Princess Cruise Lines, Ltd.*,
  2008 WL 8883868 (S.D. Fla. 2008) ........................................................33

*Russo v. Matson Navigation Co.*,
  486 F.2d 1018 (9th Cir. 1973)................................................................33

*Sarmiento Lopez v. CMI Leisure Management, Inc.*,
  565 F.Supp.3d 1271 (S.D. Fla. 2021)......................................................52

*Seas Shipping Co. v. Sieracki,*
    328 US 85 (1946) ............................................................... 25, 37, 38, 50

*Setty v. Shrinivas Sugandhalaya LLP,*
    3 F.4th 1166 (9th Cir. 2021) ............................................................29

*Socony-Vacuum Oil Co. v. Smith,*
    305 U.S. 424 (1939) ............................................................37

*Southwest Airlines Co. v. Saxon,*
    __ U.S. ___, 142 S.Ct. 1783 (2022) ........................................ 12, 19, 47

*Szumlicz v. Norwegian American Line,*
    698 F.2d 1192 (11th Cir. 1983) ............................................................43

*The Arizona v. Anelich,*
    298 U.S. 110 (1936) ............................................................37

*U.S. Bulk Carriers, Inc. v. Arguelles,*
    400 U.S. 351 (1971) ............................................................37

*Usme v. CMI Leisure Management Inc.,*
    106 F.4th 1079 (11th Cir. 2024) ................................................. passim

*Vaughan v. Atkinson,*
    369 U.S. 527 (1962) ................................................................ 25, 37

*Warner v. Goltra,*
    293 U.S. 155 (1934) ................................................................ 25, 37

*Wexler v. Sole Mates Marine, Ltd.,*
    2017 WL 979212 (S.D. Fla. 2017) ............................................................42

Statutes

9 U.S.C. §1 ........................................................................ 18, 19, 22, 27

9 U.S.C. §2 ............................................................34

9 U.S.C. §205 ................................................................ 1, 5, 41

9 U.S.C. § 208 ............................................................26

28 U.S.C. §1333 ............................................................5

28 U.S.C. §1333(1) ........................................................................2

28 U.S.C. §1446 ...........................................................................5

45 U.S.C. §51 .............................................................................25

45 U.S.C. §55 ............................................................... 13, 18, 32, 33

46 U.S.C. §30104 ............................................................. 2, 17, 31

Rules

Eleventh Cir. R. 36-2 ..................................................................45

Fed.R.Civ.P. 8(d)(2) ...................................................................53

FRAP 32(a)(7)(B) ......................................................................55

## STATEMENT OF JURISDICTION

The Defendants removed this matter from state court ostensibly pursuant to 9 U.S.C. §205, asserting that Plaintiff's contract of employment contained an arbitration provision falling under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"). It is the Appellant, Mr. Chemaly's, position that the district court never had jurisdiction because this matter does not fall under the Convention, specifically the reservation contained in Article I, Section 3, exercised by the United States at the time of accession, limited the application of the Convention to relationships considered to be commercial under the law of United States, and the plain language of the Convention, Article II, Section 1, that limits the Convention's application to subject matters capable of resolution by arbitration, because pursuant to the law of the United States, the employment contracts of seamen are not subject to arbitration.

Assuming that the district court did have jurisdiction, this Court has jurisdiction in this appeal only of the Plaintiff's appeal of those portions of the district court's Omnibus Order that were compelled to arbitration. This Court does not have jurisdiction over the Defendants' Cross Appeal of those portions of the Omnibus Order which granted Plaintiff's Motion to Remand certain claims.

## ISSUES PRESENTED:

1.    Whether *GE Energy Power Conversion France SAS Corp. v. Outokumpu Stainless U.S., LLC*, 140 S.Ct. 1637 (2020) requires this Court to revisit its interpretation of the Convention's definition of commercial and the Convention's null and void defense in *Bautista v. Star Cruises*, 396 F.3d 1289 (11th Cir. 2005) and *Lindo v. NCL (Bahamas), Ltd*, 652 F.3d 1257 (11th Cir. 2011).

2.    Whether the district court erred by compelling arbitration where there was no valid written arbitration agreement.

3.    Whether the district court erred by ruling that the non-signatories can apply equitable estoppel because the Plaintiff's claims against the non-signatory parties are based upon the borrowed servant doctrine, not the Seafarer's Employment Contract and the Plaintiff's claims do not allege the type of concerted conduct necessary for equitable estoppel.

## STATEMENT OF THE CASE AND FACTS

This is an admiralty and maritime tort claim arising under general maritime law of the United States as well as the Jones Act 46 U.S.C. §30104, et seq., and was properly brought in Florida state court under the Savings to Suitors clause of 28 U.S.C. §1333(1).

Plaintiff, Byron Chemaly, is a citizen of South Africa and was employed as a seaman working aboard the yacht M/Y Fountainhead, a 288' custom made Feadship yacht, home ported at Island Gardens Marina, Watson Island, Miami, Florida. (DE 1-2, p. 1-2). See Chemaly Declaration, Exhibit A. (DE 13-1). At the time of briefing below the Fountainhead was in port in Palm Beach, Florida and had been

since November 19, 2023.   The Defendant, Eddie Lampert, is a citizen and resident of Miami-Dade County, Florida and is the beneficial owner of and real party in interest to the yacht M/Y Fountainhead. He is the billionaire CEO of ESL Hedge Fund, and the former CEO of Sears, who in 2012, bought a house on the Indian Creek Enclave for a then record $40 million. *See* *https://www.forbes.com/sites/morganbrennan/2012/03/05/billionaire-eddie-lampert-buying-record-breaking-40-million-indian-creek-home/?sh=3cda2ec85ae86*.

In his state court Complaint, Chemaly alleged that Lampert was his borrowed servant Jones Act employer because Lampert, through his agents Gold and/or Camper controlled all aspects of Chemaly's work including but not limited to interviewing him; performing background checks and pre-employment physical, making the determination to hire him; training him; assigning him to his position aboard; determining his specific work duties; supervising him; establishing rules and regulations for performance of his work; evaluating his performance for purposes of maintaining his employment; setting the hours of work; and maintaining the right to discipline/fire him.   (DE 1-2, p. 5).

Chemaly was grievously injured on August 8, 2020 as the yacht was in the territorial waters of the United States, laying off Sag Harbor, New York, having traveled there from its home port of Miami.   (DE 1-2, p. 6).   Lampert's son had

been using a "Sea Bob" a motorized assistance device for divers, similar to devices seen in James Bond movies. (DE 1-2, p. 6). Chemaly was ordered to assist the captain in recovering the Sea Bob from the water and storing it aboard the yacht. (*Id.*) Chemaly was ordered to grab and lift one side of the Sea Bob while the captain grabbed and lifted the other side. (*Id.*) The yacht was not outfitted with a mechanical lifting device that would have permitted recovery of the Sea Bob from the water without exposing Chemaly to unreasonable risk of injury. (DE 1-2, p. 7).

As the two were lifting the Sea Bob out of the water the captain dropped his radio, which he was holding in his hand as he was attempting to lift the Sea Bob. To avoid losing the radio overboard the captain released his hold of the Sea Bob shifting all the weight to Chemaly resulting in severe injury to his right shoulder. (DE 1-2, p. 7). After the injury Chemaly was ordered to forego pain medication and was ordered to drive the yacht's automobile to reposition it for the arrival of the yacht at the next port. He was also put on nightshift so the yacht guests would not see him in his sling. (*Id.*) Furthermore, he was ordered to do further work which resulted in further injury and aggravation of his shoulder. (DE 1-2, p. 7). When the yacht returned to its home port in Miami Chemaly received medical treatment from Miami-Dade County medical providers. (DE 1-2, p. 7). He was then repatriated to his home country from Miami-Dade County, Florida. (*Id.*). The

approval and payment of Mr. Chemaly's medical treatment has been handled by US Maritime Consultants in Miami, Florida.   (DE 13-1).

### Course of Proceedings Below

Chemaly filed suit in state court on August 1, 2023.   (DE 1-2).   After obtaining several extensions of time to respond to the Complaint, Defendants filed their Notice of Removal on November 7, 2023.   (DE 1).   The Defendants purported to remove the case pursuant to 9 U.S.C. §205, 28 U.S.C. §1333, and 28 U.S.C. §1446. (*Id.*).[1]

Defendants are as follows: R. Operations is Plaintiff's purported employer as set forth in the Seafarer Employment Agreement.   (DE 5-1 at p. 2). Fountainhead Marine Limited is the shell entity that holds title to the yacht. (DE 1-2 at p. 4).   Although R. Operations and Fountainhead are ostensibly incorporated in the Cayman Islands, Plaintiff alleged below that both companies are "artifice[s] designed to avoid United States taxes and liability" and are "alter ego[s] and/or agent[s]" of Defendant Eddie Lampert, who is the "beneficial owner/real party in interest to the yacht."   (DE 1-2 at p. 4).[2]   Gold was the

---

[1] Jones Act cases are not removable under 28 U.S.C. §1333 or 28 U.S.C. §1446. The only possible basis of removal is 9 U.S.C. §205.

[2] The district court found that the ostensibly foreign Defendants had significant contacts in Florida and "purposely availed" themselves of the privilege of conducting business in Florida.   (DE 36, p. 13-16).

yacht's Captain. (DE 5-5 at p. 2). Camper & Nicholsons ("Camper") is a Florida corporation which managed the yacht's "operational, maintenance, technical and financial services, and was responsible for ensuring the yacht was adequately manned and equipped for its intended purpose, which included the deployment, use and recovery of the yacht's Sea Bob." (DE 1-2, p. 5-6 of 51).

Defendant Catlin is a foreign underwriter registered with the Florida Department of Insurance Regulation.[3]

Chemaly alleged six claims: (1) Jones Act negligence regarding the Sea Bob incident against R. Operations, Fountainhead, and Lampert; (2) Unseaworthiness against R. Operations; Fountainhead and Lampert; (3) Failure to provide maintenance and cure under the general maritime law against R. Operations, Fountainhead and Lampert; (4) A Jones Act claim for failure to treat. *See Garay v. Carnival Cruise Line Inc.*, 904 F.2d 1527 (11th Circuit 1990) ("A shipowner's failure to pay maintenance and cure not only give rise to a claim for maintenance and cure, but may also support a cause of action under the Jones Act for breach of the duty to provide maintenance and cure."); (5) Negligence against Camper, the yacht's management company; and (6) Conversion against all Defendants.

---

[3] However, Plaintiff settled his insurance-based claim against Catlin, and Catlin is not a party to this appeal.

After removal, the Defendants filed a Motion to Compel Arbitration and to Dismiss Plaintiff's Complaint for lack of personal jurisdiction. (DE 5). Chemaly moved for a 90 day stay for the consideration of the Motion to Compel Arbitration or to Dismiss in order to conduct jurisdictional discovery. (DE 13). Meanwhile, Plaintiff filed a Motion to Remand the matter to state court. (DE 10). On February 15, 2024, Plaintiff filed a Notice of Voluntarily Dismissal with Prejudice of Defendant X-L Catlin Syndicate 2003, with whom Plaintiff had settled. (DE 35).

Plaintiff responded to Defendants' Motion to Compel Arbitration and Dismiss arguing that there was no valid written agreement to arbitrate; that the Plaintiff was suing the Defendants under the borrowed servant doctrine; that his claims did not rely upon the Seafarer's Employment Agreement; that the non-signatory Defendants could not apply equitable estoppel to enforce the alleged arbitration agreement; that the court had general and specific jurisdiction over Defendants, R. Operations, Fountainhead and Gold; and that the alleged arbitration agreement was null and void because recent Supreme Court authority had rendered *Bautista v. Star Cruises,* 396 F.3d 1289 (11th Cir. 2005) and *Lindo v. NCL (Bahamas) Ltd.*, 652 F.3d 1257 (11th Cir. 2011) questionable when it comes to the interpretation of the null and void defense. (DE 15).

## The District Court's Omnibus Order

The district court addressed all pending motions, including Defendants' Motion to Compel Arbitration and Dismiss, including on the basis of personal jurisdiction, and Plaintiff's Motion to Remand, in a single Order. (DE 36). After describing the various parties, the allegations in the Complaint, the terms of the Seafarer's Employment Agreement, and the standards to be applied to those motions, the district court first determined that it had personal jurisdiction over Defendants, Gold, R. Operations, and Fountainhead – the Defendants who had raised a personal jurisdiction defense. (DE 36, p. 10-16). The court found specific jurisdiction over R. Operations, Fountainhead and Gold. (DE 36, p. 16).

The Omnibus Order then pivoted to the Motion to Compel Arbitration. Relying upon *Escobal v. Celebration Cruise Operator Inc.*, 482 F.App'x 475 (11th Cir. 2012), the district court determined that there is no conflict between the choice of forum clause and arbitration provision. (DE 36, p. 17-18).

Next, the district court ruled whether each claim against R. Operations was covered by the arbitration clause contained in separate sections of the combined document. (DE 36, p. 19-25). The district court relied upon the methodology in *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204 (11th Cir. 2011) to make that determination. (DE 36, p. 22). Utilizing that analysis, the

district court found that the Plaintiff's Jones Act negligence claim against R. Operations fell within the purview of the arbitration provision, but that Plaintiff's claims of unseaworthiness against R. Operations did not. (DE 36, p. 23-24). The district court also determined that Count III for maintenance and cure and Count IV for failure to provide proper and adequate medical care against R. Operations were subject to arbitration because they arose out of the Seafarers Employment Agreement (DE 36, p. 25).

However, the district court found that none of the conversion claims in Count VI (against all Defendants except Catlin) were subject to arbitration. (*Id.* at p. 26).

Next, the district court turned to the issue of equitable estoppel. (DE 36, p. 26-36). The district court first noted that the parties disagreed as to whether arbitration could be compelled as to the Defendants who did not sign the SEA – Fountainhead, Lampert, Camper, Catlin and Gold. (*Id.* at p. 26). The district court followed Judge Tjoflat's analysis in *Outokumpu Stainless U.S., LLC v. Coverteam SAS*, 2022 WL 2643936, at *6 (11th Cir. 2022) to determine that federal equitable estoppel law should apply over state or foreign equitable estoppel law. (DE 36, p. 27). The court also made an alternative finding that United States law would apply if the court applied the choice of law factors for

Jones Act or maritime tort actions, e.g., the *Lauritzen-Rhoditis* analysis. (DE 36, p. 27, n. 10).

The district court concluded that the Plaintiff had alleged substantially interdependent and concerted misconduct by the signatories and non-signatories, and therefore compelled arbitration. (DE 36, p. 30-31). Thus, the court concluded that Counts I, III, and IV against Lampert and Fountainhead must be arbitrated. The district court also found that Defendants, Camper and Catlin (the latter not a party to this appeal) could not compel arbitration as to any counts. (DE 36, p. 34). Furthermore, because neither Counts V or VII of the Complaint were brought against the contract signatory, R. Operations, and they did not raise "substantially interdependent and concerted misconduct by the signatories and non-signatories," those claims were remanded. (DE 36, p. 35). The court also determined that Gold, the yacht's Captain, could not compel arbitration. (DE 36, p. 36).

Finally, the district court turned to the Plaintiff's Motion to Remand and remanded the remaining Jones Act claims that are not covered by the Convention and do not arise out of the arbitration agreement to state court, specifically Count IV for Jones Act for failure to treat against non-signatories, Camper, Catlin and Gold. (DE 36, p. 37). Because the Defendants had not borne their burden to demonstrate that federal jurisdiction existed over Count II of the Complaint for

unseaworthiness (against Defendant, R. Operations, Fountainhead and Lampert); Count VI of the Complaint for conversion against all Defendants; Count V of the Complaint for negligence against Camper; and Count VII of the Complaint for breach of insurance contract against Camper and Catlin, those claims were remanded to state court. (DE 36, p. 38).

Plaintiff timely appealed that portion of the Omnibus Order which compelled arbitration, and Defendants are attempting to appeal the portion of the Omnibus Order which grants Plaintiff's Motion for Remand. On April 10, 2024, this Court issued two jurisdictional questions, and on June 20, 2024 the Court deferred ruling on those questions, carrying them with the appeal.

## STANDARD OF REVIEW

This Court reviews district court orders compelling arbitration under the *de novo* standard of review. *Employers Ins. v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1321 (11th Cir. 2001). There is no standard of review of an order granting a motion to remand, because such orders are not typically appealable. *New v. Sports and Recreation*, 114 F.3d 1092, 1095-96 (11th Cir. 1997); *Alvarez v. Uniroyal Tire Company*, 508 F.3d 639, 641 (11th Cir. 2007).

## SUMMARY OF THE ARGUMENT

The district court erred by granting Defendants' Motion to Compel Arbitration because the arbitration provision is inconsistent with a choice of law and

venue provision and the Employment Agreement provides that the choice of law and venue provisions prevail over the inconsistent arbitration provision of the Agreement. Furthermore, Chemaly's claims exist independent of a written employment agreement. *See, e.g., Usme v. CMI Leisure Management Inc.*, 106 F.4th 1079, 1089 (11th Cir. 2024).

This case differs both factually and legally from other seamen's arbitration cases involving the Convention, which have been decided by this Court. *See e.g., Bautista v. Star Cruises,* 396 F.3d 1289 (11th Cir. 2005) and *Lindo v. NCL (Bahamas) Ltd.*, 652 F.3d 1257 (11th Cir. 2011). Unlike these earlier cases, which involved suits by seamen seeking wages under Collective Bargaining Agreements ("CBAs"), while at the same time attacking the enforcement mechanism for such disputes set forth in the very same contract, this case does not involve a CBA nor does it involve claims which are grounded in or dependent on a written employment agreement.

This Court's earlier Convention decisions all pre-dated the Supreme Court's recent opinions in *GE Energy Power Conversion France SAS Corp. v. Outokumpu Stainless U.S., LLC*, 140 S.Ct. 1637 (2020); *Morgan v. Sundance, Inc.,*142 S.Ct. 1708 (2022) and *Southwest Airlines Co. v. Saxon*, __ U.S. ___, 142 S.Ct. 1783 (2022). These more recent decisions call into question the core legal principles underlying this Court's earlier decisions.

Here the district court misapplied the Supreme Court's decision in *GE Energy,* which expressly recognized the existence of various "gaps" in the Convention, *specifically* identifying the 'null and void' defense set forth in Article II, Section 3 as one of these gaps. Although the Court mandated that "the Convention *requires* courts to rely on domestic law to fill the gaps," *id*. at 1645 (emphasis added), the district court committed reversible error in relying upon pre-*GE Energy* cases to reject the Plaintiff's Article II, Section 3 defense, *because it was based* upon such domestic law.

The arbitration clause in this case is null and void under both U.S. statutory and general maritime law, which act as the gap fillers referenced by the Court in *GE Energy*. The arbitration provision violates 45 U.S.C. §55, incorporated by reference into the Jones Act as part of the FELA, which renders **void** "[a]ny contract, rule, regulation, or device whatsoever," utilized by an employer to exempt itself from any liability under the Act.

As the Supreme Court has explained, the underlying policy supporting the recognition of foreign arbitration under the Convention is the need to promote the international expansion of American business interests into world markets. The arbitration agreement the Defendants have imposed upon Mr. Chemaly was not the basis of arms-length negotiations, but their overweening bargaining power and has nothing whatsoever to do with this policy. Instead, it is merely an attempt by these

US-based Defendants to circumvent their legal obligations to their crewmember imposed by U.S. law.

The arbitration clause is also void under general maritime law, which has recognized seamen as wards of the admiralty for nearly two centuries, who are entitled to the status of a protected legal class. Accordingly, the Supreme Court has held that where seamen have been taken advantage of by their employers resulting in "any sacrifice of rights . . . which are not compensated by extraordinary benefits," any such agreements must "be *set aside* as inequitable." *Garrett v. Moore-McCormack Co., Inc.,* 317 U.S. 239, 246 (1942) (emphasis added).

## ARGUMENT

**I.** **_GE ENERGY POWER CONVERSION FRANCE SAS CORP. v. OUTOKUMPU STAINLESS U.S., LLC,_ 140 S.Ct. 1637 (2020) REQUIRES THIS COURT TO REVISIT ITS INTERPRETATION OF THE CONVENTION'S DEFINITION OF COMMERCIAL AND THE CONVENTION'S NULL AND VOID DEFENSE IN _BAUTISTA v. STAR CRUISES_, 396 F.3d 1289 (11th Cir. 2005) AND _LINDO v. NCL (BAHAMAS), LTD_, 652 F.3d 1257 (11th Cir. 2011)**

In *Bautista v. Star Cruises*, 396 F.3d 1289 (11th Cir. 2005), this Court rejected the seaman's claim that the arbitration clause in his contract was unenforceable under the "null and void" defense contained in Article II of the Convention, based upon its conclusion that this defense must "be interpreted to encompass *only* those situations – such as fraud, mistake, duress, and waiver – that can be applied neutrally

14

on an *international* scale." *Id.* at 1302. (Emphasis added).[4] At the time that *Bautista* was decided, the U.S. Supreme Court had yet to address the issue of whether the Convention's "null and void" defense would be so limited.

When the Supreme Court subsequently decided this issue fifteen years later in *GE Energy Power Conversion France SAS Corp. v. Outokumpu Stainless U.S., LLC,* 140 S.Ct. 1637, 1645 (2020) it instead determined that there was "nothing in the text of the Convention which 'conflict[s] with' the application of domestic equitable estoppel doctrines permitted under Chapter 1 of the FAA." As a result, in its analysis of the issues before it, the Court held that the Convention contained various "gaps," which, contrary to *Bautista's* conclusions, are required to be filled in by the utilization of "domestic law." The Court *expressly* identified Article II's null and void defense as one of these gaps, holding:

> Far from displacing domestic law, the provisions of Article II contemplate *the use of domestic doctrines to fill gaps in the Convention.* For example, Article II(1) refers to disputes "capable of settlement by arbitration." But it does not identify what disputes are arbitrable, leaving that matter to domestic law. Similarly, Article II(3) states that it *does not apply to agreements that are "null and void*, inoperative or incapable of being performed," but it fails to define those terms. Again, the *Convention requires courts to rely on domestic law to fill the gap; it does not set out a comprehensive regime that displaces domestic law.*

*Id.* at 1645 (emphasis added).

---

[4] *Lindo v. NCL (Bahamas) Ltd.* relied almost exclusively upon the *Bautista* analysis. Thus, it too should be revisited.

In reaching this conclusion, the Court explained that "[g]iven that the Convention was drafted against the backdrop of domestic law, it would be unnatural to read Article II, Section 3 to displace domestic doctrines in the absence of exclusionary language," which is not found in the text of the Convention itself when it comes to defining agreements "that are null and void." *Id.*[5] Therefore, *GE Energy* unequivocally rejected the conclusion in *Bautista* that since the Convention did not define the types of circumstances coming within its null and void defense, courts are limited to considering *only* those situations for which there is a "precise, *universal* definition. . . that may be applied effectively across the range of countries that are parties to the Convention." *Bautista*, 396 F.3d at 1302 (emphasis added). The two approaches could not be more at odds.

The Supreme Court remanded *GE Energy* to this Court to determine which domestic law should be used to fill these gaps, which include the null and void defense. Although two members of the panel concluded that it was not necessary to reach this determination based upon the facts of the case, Judge Tjoflat analyzed the issued in a concurring opinion and determined that U.S. federal law should be utilized. The district court below followed Judge Tjoflat's concurrence in addressing the issue of whether equitable estoppel was applicable to this case, further

---

[5] Which conclusion is consistent with the reservation the United States placed on its accession to the Convention, that the Convention would only apply to relationships considered to be commercial under the law of the United States.

holding that it would also reach the same result under the *Lauritzen-Rhoditis* choice of law analysis. (DE 36 at p. 27).

Significantly, for this appeal, the Supreme Court also noted in *GE Energy* that Article II, Section 1 refers to disputes "capable of settlement by arbitration," but does not identify what disputes are arbitrable, leaving that matter to domestic law. *Id. GE Energy*, 140 S.Ct. at 1645. Again, that holding is directly contrary to *Bautista's* holding that null and void means "only those situations – such as fraud, mistake, duress, and waiver – that can be applied neutrally on an international scale." *Bautista*, 396 F.3d at 1302. The district court specifically relied upon that now moribund holding. (DE 36, p. 8). Because *GE Energy* holds that the Convention is silent as to what disputes are "capable of settlement by arbitration," domestic law must be used to fill the gaps. And because domestic law, the Jones Act, guarantees seamen a right to trial by jury, a Jones Act claim is not "capable of settlement by arbitration."

In addition to expressly providing seamen with the right to both "civil action at law" and "the right of trial by jury," the Jones Act also expressly adopts for the benefit of seamen the "laws of the United States regulating recovery of personal injury to, or death of, a railway employee to an action [under it]." 46 U.S.C. §30104. The Supreme Court has treated the Jones Act's express adoption of The Federal Employers Liability Act ("FELA") as evidencing Congress' intent to expand upon

the protections afforded to seamen by holding that it includes both the statute itself

as well as the "entire judicially developed doctrine of liability construing it."

*Kernan v. American Dredging Co.*, 355 U.S. 426, 439 (1958). *See also, Bainbridge*

*v. Merchants' & Miners' Transp. Co.*, 287 U.S. 278, 282 (1932) ("The Jones Act

has the effect of bringing into the maritime, *for the benefit of seamen*, all appropriate

statutes relating to employers' liability for the personal injury or death of railway

employees. Both acts are to be treated as part of the maritime law.") (emphasis

added).

Central to these protections are those that are spelled out in 45 U.S.C. §55

which provided:

> Any contract, rule, regulation, or device whatsoever, the purpose or
> intent of which shall be to enable any common carrier to exempt itself
> from any liability created by this chapter, shall to that extent be void";
> and the Federal Arbitration Act, 9 U.S.C. §1 provided: ". . . nothing
> herein contained shall apply to contracts of employment of seamen . .
> .".

Therefore, the provision the district court relied upon is void.

Because "[t]he conditions at sea differ widely from those on land, and the

diversity of conditions breeds diversity of duties," *Cortes*, 287 U.S. at 377, the Court

has explained that the Jones Act's adoption of the FELA:

> . . . does not mean that the very words of the F.E.L.A. must be lifted
> bodily from their context and applied mechanically to the specific facts
> of maritime events. Rather, it means that *those contingencies against
> which Congress has provided to ensure recovery to railroad employees*

*should also be met in the admiralty setting.*

*Cox v. Roth*, 348 U.S. 207, 209 (1955) (emphasis added).

The Supreme Court has expressly noted that one of these important "contingencies" that Congress intended to prevent was "prohibit[ing] employers from contracting around the Act," which was the guiding purpose behind the adoption of 45 U.S.C. §55.  *See e.g., Norfolk So. Ry. Co. v. Sorrell*, 549 U.S. 158, 168 (2007) and *Phil., Balt. & Wash. RR Co. v. Schubert*, 224 U.S. 603, 613 (1912). Therefore, there can be no doubt that this portion of the FELA was incorporated into the Jones Act for the very same purpose – to prohibit maritime employers from contracting around it in order to deprive seamen of the rights and remedies provided to them by Congress.

*GE Energy* reiterated that federal courts are to place arbitration agreements "upon the same footing as other contracts, and no more." *Id.* at 1643. The district court's reliance on *Bautista* violates *GE Energy* and other recent US Supreme Court decisions which have clarified that the actual federal policy for analyzing the validity of arbitration agreements "is about treating arbitration contracts like all others, not about fostering arbitration," so that "a court may not devise novel rules to favor arbitration over litigation." *Morgan*, 142 S.Ct. at 1713. *See also Saxon*, 142 S.Ct. at 1792 (2022) (rejecting the district court's conclusion that its perception of a liberal public policy favoring arbitration required it to interpret the statutory exemption in

9 U.S.C. §1 narrowly, despite its "ordinary, contemporary, common meaning" to the contrary).

This Court should revisit *Bautista's* continued validity. In recognition of *GE Energy's* mandate that gaps in the Convention be filled by domestic law, this Court recently vacated two earlier decisions which had rejected this principle when dealing with the Article V defense for vacating arbitration awards by primary jurisdiction courts. See *Hidroelectrial Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.,* 66 F.4th 876 (11th Cir. 2023) (*en banc*). After finding that a gap existed in the Article V defense, because it "does not provide the grounds for vacatur," *id*. at 885, just like the Supreme Court in *GE Energy* found regarding Article II's null and void defense, this Court held "the primary jurisdiction's domestic law acts as a gap-filler and provides the vacatur grounds for an arbitral award." *Id.* at 886. We seek a similar review here by the entire Eleventh Circuit.

The issue is whether United States domestic law permits the bargaining away (assuming any actual bargaining occurred, which it did not here) of a statutory Jones Act right to a jury trial. A related question is whether an arbitration provision that is contrary to over a hundred years of U.S. domestic statutory and precedential maritime law is null and void?

In *Bautista*, this Court did not focus on domestic law; to the contrary it focused

on international law.[6]   This Court also did precisely what the Supreme Court has repeatedly stated it should not do, which is to presume that the FAA "establishes a strong presumption in favor of arbitration of international commercial disputes." *Bautista*, 396 F.3d at 1295. To the contrary, the FAA, and US Supreme Court decisions, merely hold that arbitration contracts should be viewed just like any other contract.

The Supreme Court made that point clear not only in *Outokumpu*, but also in *Morgan v. Sundance Inc.,* 142 S.Ct. 1708 (2022).   In *Morgan,* the Supreme Court overruled nine circuit courts of appeal, including this Court, which had crafted a rule of law that required a showing or prejudice in order to establish that a party had waived its right to arbitration:

> Nine circuits, including the Eighth have invoked "the strong federal policy favoring arbitration" in support of an arbitration-specific waiver rule demanding a showing of prejudice. Two circuits have rejected that rule. We do too.

142 S.Ct. at 1712. (footnotes omitted). The court noted that outside the arbitration context, federal courts assessing waiver do not generally ask about prejudice. *Id.* at 1713.   Moreover, the FAA's general policy favoring arbitration does not authorize federal courts to invent special, arbitration-preferring procedural rules:

> "Th[e] policy," we have explained "is merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal

---

[6] This is perhaps not surprising as *Bautista* was authored by the Chief Judge of the United States Court of International Trade, siting by designation.   *Bautista* at n. *.

to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." . . . Or in another formulation: The policy is to make "arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood and Conklin Mfg. Co.*, 388 U.S. 395, 404, n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). . . . But a court may not devise novel rules to favor arbitration over litigation. *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 218-221, 105 S.Ct. 1238. 84 L.Ed.2d 158 (1985). . . **The federal policy is** about treating arbitration contracts like all others**, not about fostering arbitration**. . . A directive to a federal court to treat arbitration applications in the manner provided by law for all other motions is a bar on using custom made rules to tilt the playing field in favor of (or against) arbitration.

*Id.* at 1713-1714 (citations omitted; emphasis added).   Given these recent Supreme Court decisions, *Bautista* and *Lindo* must be revisited.

### Congress Expressly Excepted Seaman's Employment Contracts from Arbitration

9 U.S.C. § 1 is clear in is its exception of employment contracts of seaman from arbitration:

> …nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.

The exclusion of seaman's employment contacts from the reach of arbitration was not a mistake. *Circuit City Stores v. Adams,* 532 US 105, 121 (2000) (Congress excluded seaman from the FAA because it did not want to unsettle established or developing *statutory dispute schemes covering specific workers)*. (Emphasis added.)

9 U.S.C. §1's exception for contracts of employment of seamen is a "gap filler"

under *GE Energy*.

In *Bautista*, this Court rejected an argument similar to the one that the United States Supreme Court accepted in *GE Energy*. The plaintiff seaman in *Bautista* argued that "the Convention Act is silent as to seamen's employment contracts." *Bautista*, 396 F.3d at 1299. This Court concluded that "the Convention's framers understood that the benefits of the treaty would be undermined if domestic courts were to inject their 'parochial' values into the regime. . . ." *Id.* at 1300. Again, those statements are directly at odds with the Supreme Court's holdings in *GE Energy* that where the Convention, a treaty, is silent on a matter, courts should look to domestic law as a gap filler. The United States domestic law with respect to Jones Act claims and seamen claims in general, is that a seaman is entitled to trial by jury.

And that domestic law has deep roots. The first legislation undertaken by the Congress of this new republic included an act to protect seaman. Recognizing that seamen had historically been subject to exploitation by ship owners, The Act for the Government and Regulation of Seamen was passed by the First Congress July 20, 1790, and required that prior to departing on a voyage ***the ship and the seaman must make an agreement in writing*** declaring the voyage or voyages and term or terms of time for which the seaman would be committed. Some additional protections provided by the act were the timely payment of wages, the requirement to provide a

seaworthy vessel and the requirement that certain ships carry a "medicine chest".[7]

Shortly thereafter, Justice Story issued his ruling in *Harden v. Gordon,* 11 F.Cas. 480 (D. Maine 1823), which emphasized the judiciary's role in protecting seamen from overreaching by their employers:

> Every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel; because they are credulous and complying; and are easily overreached, [courts are] in the constant habit of extending towards them a peculiar, protecting favor and guardianship. They are emphatically the wards of the admiralty
>
> Hence every deviation from the terms of the common shipping paper, (which stands upon the general doctrines of maritime law,) is rigidly inspected; and if additional burthens or sacrifices are imposed upon the seamen without adequate remuneration, the court feels itself authorized to interfere and moderate or annul the stipulation.

The solicitude of the courts and Congress for seamen has been recognized again and again, even in modern times. *Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 417 (2009) (This Court has consistently recognized that the [Jones] Act 'was remedial, for the benefit and protection of seamen who are peculiarly the wards of admiralty. Its purpose was to enlarge protection, not to narrow it.'"); *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 387 (1970) (Maritime law had always, in this country as in England, been a thing apart from the common law…

---

[7] First Congress, Session II, Chapter 29; 1 Stat. 131; July 20, 1790.

These principles included a special solicitude for the welfare of seamen."); *Vaughan v. Atkinson,* 369 U.S. 527, 531-532 (1962) (Jones Act provides for "the protection of seamen, who, as a class, are poor, friendless and improvident, from the hazards of illness and abandonment while ill in foreign ports" as well as "the inducement to masters and owners to protect the safety and health of seamen while in the service . . ."); *Seas Shipping Co. v. Sieracki,* 328 US 85, 104 (1946) ("the seaman has been given a special status in the maritime law as the ward of admiralty, entitled to special protection"); *Barrett v. Moore-McCormack Co.,* 317 U.S. 239, 246 (1942) (Congress has generally sought to safeguard seamen's rights.  In 1790, the first Congress passed a protective act for seamen.  A release of rights is subject to "careful scrutiny". The Jones Act is to be liberally construed to carry out its full purpose, which was to enlarge admiralty's protection of its wards.); *Warner v. Goltra,* 293 U.S. 155, 162 (1934) (the ordinary seaman is a member of favored class, he is a ward of the admiralty, often ignorant and helpless, and so in need of protection against himself as well as others.)

When congress passed the Jones Act in 1920, an amendment to the LaFollette-Furuseth Seaman's Act of 1915[8], it incorporated by reference all statutes of the United States modifying or extending the common law right or remedy in cases of personal injury to railway employees, FELA, 45 U.S.C. §51 *et. seq.*, which rendered

---

[8] 38 Stat.1164 (1915).

void any contract, rule, regulation, or device whatsoever the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by the Act.

Then in 1925 as Congress was contemplating passing the original Federal Arbitration Act, an impassioned seaman's advocate named Andrew Furuseth (called the Abraham Lincoln of the Seas), immediately brought it to Congress' attention that all strides that had just been made to protect seamen from the oppressions of their employers would be lost if the Arbitration Act were to apply to them. Furuseth noted that, by arming shipowners with arbitration clauses, "the 'seaman's right to wages [by contract and under the Seamen's Act], to food [under maritime law], [and] to damages under the Jones Act . . . becomes void . . . *The ship-owner needs only this bill to become law and slavery is restored without any other noise, except such as the victim may make.*" 26 Proc. Ann. Convention Int'l Seamen's Union Am. 83-84 (1923) (also reprinted at 17 Berkeley J. Emp. & Lab. L. 282, 301).

So, at the urging of Furuseth and others, the draft bill was then modified to add language specifically excepting seamen's employment contracts (transportation workers) from the operation of Title 9, as endorsed by then Secretary of Commerce Herbert Hoover. Joint Hearings before the Subcommittees of the Committees of the Judiciary, Congress of the United States, 68th Session, January 4, 1924, House Committee Print Serial 4, p. 21. Congress accepted the change, and Title 9 – as

passed, and as it still exists today – included the definitions of "maritime transactions" and "commerce," from which seamen's employment contracts are specifically excepted.

When the United States acceded to the Convention it specifically did so with the reservation allowed under Article I, Section 3, that the Convention would only be applied to differences considered commercial under the national law of the United States. 1970 U.S.T. LEXIS 115, *36.   When the Convention was incorporated into law, 9 U.S.C. § 208, provides that the definitions of 9 U.S.C. §§ 1 et. seq, would apply to the extent not inconsistent with Chapter 2.

"…[I]t is the congressional intention expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable". *Mitsubishi Motor Corp. v. Soler Chrysler Plymouth, Inc.,* 473 U.S. 614, 627, 639 n. 21 (1985)[9]; *Green Tree Fin. Corporation-Alabama v. Randolph,* 531 U.S. 79, 90 (2000) (In determining whether statutory claims may be arbitrated, we first ask whether the parties agreed to  submit their claims to arbitration, and then ask whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.)

As noted by Justice Gorsuch in *New Prime, Inc. v. Oliveria,* 139 S.Ct. 532,

---

[9] *Mitsubishi Motor Corp. v. Soler Chrysler Plymouth, Inc.,* 473 U.S. 614, 639 n. 21 (1985) (Art. II, Section 1 of the Convention contemplates exceptions to arbitrability grounded in domestic law).

537 (2019), while the court's authority to compel arbitration under the arbitration act was considerable, it was not unconditional. By the time of passage of the Arbitration Act, Congress had already prescribed alternative employment dispute resolution regimes for transportation workers and did not want to unsettle those arrangements in favor of arbitration. See also *Circuit City Stores v. Adams,* 532 US 105, 121 (2000), *supra.* It defies reason to believe that Congress would sweep away almost 200 years of Congressional and judicial protections without so much as a whisper.

### U.S. Federal Maritime Law Is The Applicable Domestic Law Which Must Be Used To Fill This Gap

Although the Court in *GE Energy* held that Article II of the Convention has various "gaps," which are to be filled in by the courts through the use of "domestic doctrines," *id.,* it left the issue of "which body of law governs" the domestic law utilized to fill in these gaps for resolution by this court on remand. *Id.* at 1648.

On remand, two of the panel members concluded that they did not need to decide this question, since they determined that it was unnecessary to utilize equitable estoppel to find that Outokumpu and GE Energy were actual parties to the arbitration agreement. *Outokumpu Stainless USA v. Coverteam SAS,* 2022 WL 2643936 (11th Cir. 2022) at *8. However, in a concurring opinion, the third panel member indicated that the Court's mandate required an answer to the question posed on remand. *Id.* at *12-3.

The concurring opinion rejected the defendant's argument to apply German law, selected by the contract's choice-of-law provision, by pointing out "we aren't dealing with the substantive issues in the appeal right now. We are dealing with the threshold inquiry of arbitrability. . . ." *Id*. at *14.

The concurring opinion next settled upon the federal interest analysis utilized by the Court in *Boyle v. United Technologies Corporation*, 487 U.S. 500 (1988) for making this analysis, concluding "the *Boyle* test counsels in favor of applying federal common law to threshold questions of arbitrability. . ." *Outokumpu*, 2022 WL 2643936 at *17.

In support of this conclusion, it looked to *Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166 (9th Cir. 2021), which concluded that federal law is the proper source for determining the arbitrability of federal claims, particularly where "the federal statute in question demands national uniformity." 3 F.4th at n. 1, *quoting InterGen N.V. v. Grina*, 344 F.3d 134, 143 (1st Cir. 2003). This rationale is particularly important in maritime cases in which the rule of uniformity plays a central role. *See, e.g., Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990).

In *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626 (1985), the Court also contemplated that U.S. federal law would govern the initial determination of the validity of arbitration agreements:

Accordingly, the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. The court is to make this determination by applying the "federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act."

Utilization of the *Boyle* analysis would produce the same result in this case as reached by the concurring opinion in *Outokumpu*. Few subject matters involve the same degree of federal interest as the enforceability of contracts seeking to affect seamen's actions subject to the Jones Act, based upon the importance of the longstanding principle of uniformity underlying its application in the United States. *See, e.g., Garrett,* 317 U.S. at 244 ("This Court has specifically held that the Jones Act is to have a uniform application throughout the country, unaffected by 'local views of common rules.' *Panama R. Co. v. Johnson*, 264 U.S. 375, 392 (1924). The Act is based upon, and incorporates by reference, the Federal Employers' Liability Act, which also requires uniform interpretation. . . . In many other cases this Court has declared the necessary dominance of admiralty principles in actions in vindication of rights arising from admiralty law.").

Although the end result would be the same, the use of the *Lauritzen-Rhoditis* choice of law test would seem the more appropriate vehicle for identifying the proper domestic law to fill in the Article II gaps in maritime cases, such as this one. In *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 382 (1959), which extended the *Lauritzen* choice-of-law analysis from Jones Act cases to maritime

claims in general, the Court pointed out that this analysis is consonant with the needs of a general federal maritime law and with due recognition of our self-regarding respect for the relevant interests of foreign nations in the regulation of maritime commerce as part of the legitimate concern of the international community. . . The controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them we must move with the circumspection appropriate when this Court is adjudicating issues inevitably entangled in the conduct of our international relations.

Such an analysis, which is based upon respect for the relevant interests of foreign countries that are applicable to the controversy in the maritime context, is particularly appropriate and well suited for use in filling the gaps in a treaty designed to adjudicate such international commercial disputes.

## 1. U.S. Statutory Law

The Jones Act, guarantees that:

> [a] seaman injured in the course of employment . . . may elect to bring *a civil action at law, with the right of trial by jury*, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, *a railway employee apply to an action under this section*.

46 U.S.C. §30104 (emphasis added).

The Supreme Court has treated the Jones Act's express adoption of the FELA as evidencing Congress' intent to *expand* upon the protections afforded to seamen

by holding that it includes *both* the statute itself as well as the "*entire judicially developed doctrine* of liability construing it." *Kernan v. American Dredging Co*., 355 U.S. 426, 439 (1958) (emphasis added). *See also Bainbridge*, 287 U.S. at 282 ("The Jones Act has the effect of bringing into the maritime law, *for the benefit of seamen*, all appropriate statutes relating to employers' liability for the personal injury or death of railway employees. *Both acts* are to be treated as part of the maritime law.") (emphasis added).

In *Cox v. Roth*, 348 U.S. 207, 209 (1955), the Supreme Court explained that the Jones Act's express incorporation of the provisions of the FELA "means that those contingencies against which Congress has provided to ensure recovery to railroad employees should also be met in the admiralty setting." The Supreme Court has repeatedly pointed out that one of these important "contingencies" that Congress intended to prevent was "prohibit[ing] employers from contracting around the Act." *Norfolk Co. Ry. Co. v. Sorrell*, 549 U.S. 158, 168 (2007) (and cases cited therein). *See also Philadelphia, B & W.R. Co. v. Schubert*, 224 U.S. 603, 613 (1912) ("The 'purpose or intent' of the contracts and regulations, within the meaning of [45 U.S.C. §55], is to be found in their necessary operation and effect in defeating the liability which the statute was designed to enforce.   Only by such general application could the statute accomplish the object which it is plain that Congress had in view.").

Thus, Congress' express incorporation of the provisions of the FELA into the

Jones Act was intended in part to protect the rights and remedies, which it had created for both classes of workers from usurpation by their employers. In order to accomplish this goal, it enacted 45 U.S.C. §55 as part of the FELA (and by extension the Jones Act), which explicitly prohibits:

> *Any contract*, rule, regulation, or *device whatsoever*, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be *void*. (emphasis added).

*See Russo v. Matson Navigation Co.*, 486 F.2d 1018, 1019 (9th Cir. 1973) (acknowledging the incorporation of 45 U.S.C. §55 into the Jones Act).

As noted above, the Jones Act provides seamen, including the Plaintiff, with the following remedies: (1) the right to a *civil action at law*, (2) the determination of their case *by a jury* and (3) all of the rights, claims, *doctrines* and remedies provided to railway workers under both the FELA itself *and* the "entire judicially developed doctrine of liability construing it." See *Jacob v. New York City*, 315 U.S. 752, 753 (1942) (Describing the right to a jury trial guaranteed to seamen under the Jones Act as a "basic and fundamental feature of our system of federal jurisprudence," which "is so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, [it] should be jealously guarded by the courts.). *See, e.g., Rozanska v. Princess Cruise Lines, Ltd.*, 2008 WL 8883868 (S.D. Fla. 2008) at *16-7 (The court refused to enforce the contractual forum selection and choice-of-law clauses because their "purpose . . . was to deprive Plaintiff of her Jones Act and

maintenance and cure causes of action.").

Clearly, the subject arbitration clause, which exempts the Defendants from the rights, doctrines, liabilities and remedies created by the Jones Act, constitutes a "contract . . . or device" which is rendered *void* by the express language of 45 U.S.C. §55. As such, it undoubtedly falls within the ambit of Article II, Section 3's "null and void" defense under the construction *mandated* by the Court in *GE Energy*.

### 2. Under General Maritime Law

The generally accepted definition of "null and void" is a contract or provision "having no force, binding power, or validity." *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/null%20and%20void (visited Feb. 11, 2024). *The New Oxford American Dictionary* (2001 ed.) at page 1175, likewise defines "Null" as "having no legal or binding force; invalid." Similarly, *Black's Law Dictionary* (11th ed. 2019) at page 1285, defines a contract or provision that is "Null" as "Having no legal effect; no binding force; void < the contract was declared null and void > The phrase null and void is a common redundancy." The essence of these definitions is that a contract or provision which is "null and void" is one that is *unenforceable or invalid*.

9 U.S.C. §2, which serves a similar function for the FAA as Article II does for the Convention, by setting forth specified exceptions to requiring the enforcement of those arbitration agreements otherwise meeting the criteria of the

Act, utilizes similar terminology. While Article II identifies the exceptions to the Convention as those which have rendered the agreement "null and void, inoperable or incapable of being performed," 9 U.S.C. §2 defines them as those which "exist *at law or in equity* for the revocation of *any* contract." (emphasis added). In *GE Energy*, the Court referenced this statutory provision in its discussion of the exceptions to the enforcement of arbitration agreements under the Convention, "explain[ing], this provision requires federal courts to 'place [arbitration] agreements 'upon the same footing as other contracts.'" 140 S.Ct. at 1643.

In construing the potential defenses meeting this definition under the FAA, the Ninth Circuit has previously held that "Federal law 'directs courts to place arbitration agreements on *equal* footing with other contracts. Arbitration agreements, accordingly, are subject to *all defenses* to enforcement that apply to contracts generally." *Ingle v. Circuit City Stores,* 328 F.3d 1165, 1170 (9th Cir. 2003) (citations omitted) (emphasis added). This policy was recently reiterated by the Supreme Court in *Morgan*, where it held: "The policy is to make 'arbitration agreements as enforceable as other contracts, but not more so. . .' [A] court may not devise novel rules to favor arbitration over litigation." 142 S.Ct. at 1713-4 (citations omitted).

As a result, under domestic U.S. law arbitration agreements may be rendered unenforceable, or null and void, on *any ground* that would constitute a defense to

the enforcement of any other contract involving the same substantive subject matter,

including violations of the domestic national policy applicable to such contracts.

For example, in *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15 (1972)

(emphasis added), the Supreme Court concluded that

> [a] contractual choice-of-forum clause should be held *unenforceable* if
> enforcement would contravene a *strong public policy* of the forum in
> which suit is brought, *whether declared by statute or by judicial
> decision.* See, e.g. Boyd v. Grand Trunk W.R. Co. . .

The reference in *Bremen* to the effect of the violation of strong domestic

public policies, whether the result of statute *or judicial decision*, is particularly

relevant in the arbitration context in light of the *Bremen* Court's subsequent

extensive reliance in *Mitsubishi* upon creating some of the same safety values for

the non-enforcement of arbitration provisions.[10] See, *e.g.*, *Mitsubishi*, 473 U.S. at

632-3 ("the party may attempt to make a showing that would warrant setting aside

the forum-selection clause—that the agreement was '[a]ffected by fraud, undue

influence, or overweening bargaining power'; that 'enforcement would be

unreasonable and unjust'; or that proceedings 'in the contractual forum will be so

gravely difficult and inconvenient that [the resisting party] will for all practical

---

[10] The reason for this reliance was the Court's reasoning that the policies underlying *freely
negotiated* foreign forum selection clauses and arbitration agreements between commercial
interests were both designed to encourage "[t]he expansion of American business and industry"
into international markets. *Mitsubishi*, 473 U.S. at 629.

purposes be deprived of his day in court.' *The Bremen,* 407 U.S., at 12, 15, 18. . . .").

### a. The U.S. Public Policy Protecting Seamen

For nearly two centuries, the domestic policy of the United States has been to treat seamen as a protected legal class. See *Harden v. Gordon*, 11 F. Cas. 480 (Cir. Ct. D. Maine 1823). Accordingly, in an unbroken line of opinions,[11] the Supreme Court has continued over the years to characterize seamen as "wards of the admiralty," entitled to a special protected legal status. In the process, explaining that the reason for this status derives from the myriad different ways in which their maritime calling contrasts from land-based occupations.

This line of cases has continued into recent years with the Court's important

---

[11] *See, e.g., Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 417 (2009) ("This Court has consistently recognized that the Act 'was remedial, for the benefit and protection of seamen who are peculiarly the wards of admiralty. Its purpose was to enlarge protection, not to narrow it."); *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995); *U.S. Bulk Carriers, Inc. v. Arguelles*, 400 U.S. 351, 355 (1971); *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 387 (1970)("Maritime law had always, in this country as in England, been a thing apart from the common law. . . These principles included a special solicitude for the welfare of seamen. . ."); *Vaughn v. Atkinson*, 369 U.S. 527, 531-2 (1962); Cox v. Roth, 348 U.S. 207, 209 (1955); *Isbrandtson Co. v. Johnson*, 343 U.S. 779, 783 (1952); *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 104 (1946) ("the seaman has been given a special status in the maritime law as the ward of admiralty, entitled to special protection"); *O'Donnell v. Great Lakes Dredge & Dock Co*., 318 U.S. 36, 40 (1943); *Garrett v. Moore-McCormack Co*., 317 U.S. 239, 246 (1942); *Socony-Vacuum Oil Co. v. Smith*, 305 U.S. 424, 431 (1939)(and cases cited therein); *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528 (1938)(extending the obligation to provide maintenance and cure beyond the end of the voyage for"'[t]he protection of seamen, who, as a class, are poor, friendless and improvident from the hazards of illness and abandonment while ill in foreign ports."'); *The Arizona v. Anelich*, 298 U.S. 110, 123 (1936); *Warner v. Goltra*, 293 U.S. 155, 162 (1934)("the maritime law by inveterate tradition has made an ordinary seaman a member of a favored class. He is a 'ward of the admiralty,' often ignorant and helpless, and so in need of protection against himself as well as others."); *Bainbridge*, 287 U.S. at 282.

maritime decisions in cases such as *Townsend,* 557 U.S. at 417 and *Chandris*, 515

U.S. at 354.   These more recent cases have continued to justify this protected status

even today, because of the seaman's "peculiar relationship to the vessel, and 'as a

feature of the maritime law compensating or offsetting the special hazards and

disadvantages to which they who go down to sea in ships are subjected.'" *Chandris,*

515 U.S. at 354 *quoting Sieracki*, 328 U.S. at 104.

In *Collie v. Fergusson*, 281 U.S. 52 (1930), the Supreme Court recognized yet

another peril faced by seamen, "the harsh consequences of *arbitrary and*

*unscrupulous actions of their employers, to which they as a class are peculiarly*

*exposed*." *Id.* at 55 (emphasis added). As further explained by the Fifth Circuit,

seamen:

> enjoy this status [as wards of admiralty] because they occupy a unique
> position. A seaman isolated on a ship on the high seas is often
> vulnerable to the exploitation of his employer.   Moreover, there exists
> a *great inequality in bargaining position* between large shipowners and
> unsophisticated seamen.   Shipowners generally control the
> availability and terms of employment.

*Castillo v. Spiliada Maritime Corp*., 937 F.2d 240, 243 (5th Cir. 1991) (emphasis

added).

As a result, the Supreme Court has a long history of protecting seamen from

schemes designed to deprive them of their remedies created by both federal statute

(Jones Act, Seamen's Wage Act) as well as by general maritime law (maintenance

and cure, unseaworthiness).   For example, in *Cortes v. Baltimore Insular Lines*, 287

U.S. 367 (1932) the Court made it clear that the employer's duty to provide maintenance and cure "is *imposed by the law itself* as one annexed to the employment" and as a result "*no agreement* is competent to abrogate [it]."  *Id.* at 371 (emphasis added).  Likewise, in *Reed v. Steamship Yaka,* 373 U.S. 410, 413 (1963) (emphasis added), it held that the "shipowner's obligation of seaworthiness *cannot* be shifted, limited, or escaped by contracts . . .  in that the shipowner's obligation is rooted, not in contracts, but in the hazards of the work."

By virtue of the protections afforded to them as wards of the admiralty, the Court has described the exceedingly high standard which *must* be utilized in determining the enforceability of contractual provisions seeking to deprive seamen of their guaranteed remedies:

> 'They are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs . . . If there is *any undue inequality* in the terms, any disproportion in the bargain, *any sacrifice of rights* on one side, which are *not compensated* by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is *unjust and unreasonable*, that advantage has been taken of the situation of the weaker party, and that *pro tanto* the bargain ought to be *set aside as inequitable*.

*Garrett,* 317 U.S. at 246-7 (emphasis added) *quoting Harden*, 11 Fed.Cas. at 485 (setting aside a provision in seamen's contract exempting his employer from liability to pay for medical expenses on the grounds that it violated the public policy protecting seamen as wards of the admiralty).

Thus, the Supreme Court has held that contractual provisions violating these principles are against U.S. national policy and as a result must be "set aside," hence rendered null and void.

### 3. The Existence of A Potential Subsequent Article V Remedy Does Not Excuse The District Court's Error In Compelling Arbitration

Prior to *GE Energy,* the circuit courts generally limited arguments based upon violations of domestic public policy to the defense recognized by Convention Article V, Section 2(b), that "the *recognition or enforcement of the award* would be contrary to the public policy of [the forum] country." (emphasis added). Accordingly, this defense by its terms can only be raised after an award is entered by the arbitrator(s), since it is the *recognition of such an award* by the forum country which violates its public policy.

Following *GE Energy,* it is now clear that violations of domestic public policy, which are sufficient under the applicable domestic law to *render the arbitration agreement itself* unenforceable, may be raised prior to the arbitration as an Article II null and void defense. The effect of such a defense is to prevent the arbitration from occurring in the first instance.

It is an elementary principle that "arbitration is a matter of contract and a party cannot be required to arbitrate any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83 (2002). Accordingly, where

there is no enforceable arbitration agreement, a court has no legal authority to require a party to arbitrate in the first instance. Therefore, a defense arising *after* arbitration, which refuses to enforce an arbitration award is not the equivalent of a defense finding an arbitration agreement null and void, even if they are both based upon the same underlying public policies.

Because the district court's Order was premised initially upon a *Bautista* analysis, and because *GE Energy* and *Bautista* cannot be squared, *Bautista* must give way. We urge this Court to reconsider *Bautista*, and *Lindo* which relied upon *Bautista*, given the United States Supreme Court's recent decision in *GE Energy*.

## II. <u>THE DISTRICT COURT ERRED BY COMPELLING ARBITRATION WHERE THERE IS NO VALID WRITTEN ARBITRATION AGREEMENT</u>

The district court ruled that Chemaly's Seafarer Agreement is an agreement to arbitrate under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §205. (DE 36). The district court was wrong.

There are four jurisdictional prerequisites that must be met under the Convention: (1) there is an agreement in writing to arbitrate the dispute within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a Convention signatory; (3) the agreement arises out of a commercial legal relationship; and (4) a party to the agreement is not an American citizen, or that the

commercial relationship has some reasonable relation with one or more foreign states. *Bautista v. Star Cruises*, 396 F.3d 1289, 1294, 1295, n. 7 (11th Cir. 2005). Where these jurisdictional requirements are not met, removal is improper. *Wexler v. Sole Mates Marine, Ltd.,* 2017 WL 979212 at *3 (S.D. Fla. 2017).

Here, Chemaly and R. Operations did not have an agreement to arbitrate. The district court incorrectly found that Mr. Chemaly's "Seafarer Employment Agreement and Statement of Terms and Conditions for permanent service on board M/Y Fountainhead" (DE 5-1), contains such an agreement. Here, the contract consisted of two separate agreements. The first, the Seafarer Employment Agreement, which consists of identifying information of the seafarer, the employer, shipowner, some limited definitions and Schedule A – Employee Specific Terms & Conditions. The second, Schedule B- General Terms of Employment which contains the Statement of Terms and Conditions.

Section 6.1 of "Schedule A – Employee Specific Terms and Conditions" provides:

> The terms of your employment are governed by this Employment Agreement and the General Terms and Conditions. **If there is any inconsistency between this Employment Agreement and the General Terms and Conditions, the terms of this Employment Agreement will prevail."**

(DE 1-1, p. 5 of 18). (Emphasis added.)

Section 6.9 of the "Employee Specific Terms and Conditions" provides:

> This Employment Agreement and all matters (including, without limitation, any contractual or non-contractual obligation) arising from or connected with it are governed by, and will be construed in accordance with, the laws of the Cayman Islands. **The parties submit to the exclusive jurisdiction of the courts of Cayman Islands**.

(DE 1-1, p. 6 of 18). (Emphasis added.) Immediately thereafter, on page 6 of 17, the parties' signatures appear on the Employment Agreement.

Schedule B, containing the "General Terms of Employment," appears *after* the signature block. Paragraph 28 on page 17 of the General Terms contains the one sentence arbitration reference upon which the district court based its ruling. It provides:

> 28.1 Should there be any dispute arising out of the Agreement, it shall be submitted for arbitration in the Cayman Islands.

(DE 1-1, p. 17 of 18).

Clearly, Section 28.1 of the General Terms and Conditions conflicts with paragraph 6.9 of the Employment Agreement which provides that "The parties submit to the exclusive jurisdiction of **the courts** of Cayman Islands."[12] (Emphasis added.) Thus, pursuant to Section 6.1 the inconsistency between the Employment Agreement which provides that disputes shall be referred to the **courts** of the Cayman Islands and the General Terms which references arbitration, compels

---

[12] The Defendants did not file a Motion to Dismiss based on *forum non conveniens*. Under *Szumlicz v. Norwegian American Line*, 698 F.2d 1192 (11th Cir. 1983) the court would first decide under choice of law principles whether the law of the United States should be applied. *Id.* at 1995. Because the district court has determined that Defendants have a US base of operations, the case could not be dismissed for *forum non conveniens*.

enforcement of the Employment Agreement over the General Terms. Thus, there is no basis in law or fact supporting Defendants' Notice of Removal and this Court must reverse for the district court to remand this matter to Florida state court.

The second sentence of §6.1 expressly contemplates that there may be conflicts between the two agreements, in which case the specific terms in the employment agreement must prevail. Therefore, the district court refused to give effect to the express provisions of the contract and redrafted it to reflect the court's intent, not the parties' intent.

The district court held that the arbitration clause would be rendered meaningless under Chemaly's interpretation because it would be voided by the choice of forum clause and therefore "would have no purpose, and that is an interpretative no-no." (DE 36, p. 18 (quoting *Doe v. Princess Cruise Lines*, 657 F.3d 1204, 1218 (11th Cir. 2011)). Respectfully, the district court misapplied that observation from *Doe*. In *Doe* the court was interpreting a single arbitration provision. In *Doe*, there was no provision like Section 6.1 which anticipated and provided for inconsistencies between the employment agreement and the general terms and conditions, requiring the terms of the employment agreement to prevail over the general terms and conditions.

A maritime contract is ambiguous where it is susceptible of two reasonable and practical interpretations, and an ambiguous provision in a maritime contract is

interpreted against the drafter.  *Davis v. Valsamis, Inc.*, 752 Fed.Appx. 688, 692 (11th Cir. 2018) (citing *Edward Leasing Corp. v. Uhlig & Assoc. Inc.*, 785 F.2d 877, 889 (11th Cir. 1986)).

The district court's reliance upon *Escobal v. Celebration Cruise Operator Inc.*, 482 Fed.App'x 475 (11th Cir. 2012) is misplaced for several reasons.  First, *Escobal* is an unpublished opinion, and therefore has no precedential value.  *See McNamara v. Geico*, 30 F.4th 1055 (11th Cir. 2022) which reversed an unpublished opinion, *Cawthorn v. Auto-Owners Ins. Co.*, 791 F.Appx. 60 (11th Cir. 2019) issued just three years earlier, reminding lower courts that "while our unpublished opinions 'may be cited as persuasive authority,' they 'are not considered binding precedent.'" *Id.* at 1060 citing Eleventh Cir. R. 36-2.  "Accordingly, a district court shouldn't simply cite to one of our unpublished opinions as the basis for its decision without separately determining that it is persuasive."  *Id.*

Returning to *Escobal*, the first distinction between that case and this case is that the defendants there "agreed to allow the application of U.S. law to Escobal's statutory claims."  *Id.* at 476.  Here, the Defendants have not.  Second, the plaintiff in *Escobal* argued that the arbitration provision was permissive rather than mandatory.  *Id.*  Plaintiff makes no such claim here.  Rather, Plaintiff relies upon the "inconsistency" provision in the contract drafted by the Defendants.

While the unpublished *Escobal* opinion found that the litigation choice of

forum provision did not render the arbitration provision ambiguous (citing two non-maritime non-binding sister circuit court opinions) the two provisions in *Escobal* were contained within the same paragraph. The *Escobal* agreement did not contain a provision like Section 6.1 which provides that any inconsistency between the Employment Agreement and the General Terms and Conditions must be reconciled in favor of the Schedule A – Employment Agreement and resolution in court over the Schedule B – Terms and Conditions which refers to arbitration.

Furthermore, *Escobal* did not have the benefit of recent Supreme Court clarification provided by *GE Energy* and *Morgan v. Sundance Inc.*, __ U.S. ___, 142 S.Ct. 1708, 212 L.Ed.2d 753 (2022) which explains that the so-called pro-arbitration policy of federal courts is merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts, not on a better footing. Instead, the Court held that its prior statements regarding the federal policy favoring arbitration were intended as "merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to *place such agreements upon the same footing as other contracts.*" *Id.* at 1713 (emphasis added).

The Court defined the *actual federal policy* for analyzing, interpreting, and evaluating the validity of arbitration agreements by explaining:

The policy is to make "arbitration agreements *as enforceable as other contracts, but not more so.*"  Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind.  But a court may not devise novel rules to favor arbitration over litigation . . . The federal policy is about treating arbitration contracts like all others, *not about fostering arbitration*.

*Id.* (internal citations omitted) (emphasis added).  *See also, Southwest Airlines Co. v. Saxon*, __ U.S. ___, 142 S.Ct. 1783 (2022).

As the movant below, the Defendants bore the initial burden to show that an agreement to arbitrate exists.  *De Gracia v. Royal Caribbean Cruises Ltd.*, 580 F.Supp.3d 1217, 1224 (S.D. Fla. 2022) (citing cases).  When deciding whether the parties agreed to arbitrate the courts generally should apply ordinary state law principles that govern the formation of contracts.  *Financial Advisors, Inc. v. Makarewicz*, 122 F.3d 936, 940 (11th Cir. 1997) (quoting *First Options of Chicago Inc. v. Kaplan*, 514 U.S. 938 (1995).  Thus, whether or not the parties agreed to arbitrate a dispute is decided based on state law contract principles.  *Johns v. Taramita, Inc.*, 132 F.Supp.2d 1021, 1025, n. 6 (S.D. Fla. 2001).  Here, those principles require adherence to the terms of the contract, such that the provision requiring litigation of disputes prevails over the inconsistent arbitration provisions.

An ambiguous word or phrase in a contract has been defined as one that is "susceptible of interpretation in opposite ways" or "reasonably or fairly susceptible to different constructions."  *Hancock v. Brumer, Cohen, Logan, Kandell & Kaufman*, 580 So.2d 782, 784 (Fla. 3d DCA 1991).  Here, there is no ambiguity

because the terms of the Employment Agreement control if there is any inconsistency. However, to the extent that there is an ambiguity created by that inconsistency, it should be determined against the drafters of the contract, which are the Defendants. *Berkovich v. Casa Paradiso North, Inc.*, 125 So.3d 938, 940 (Fla. 4th DCA 2013).

Here, the drafter Defendants included directions for resolving ambiguities in the Employment Agreement itself. Where a provision in the General Terms and Conditions is inconsistent with a term in the Employment Agreement, the Employment Agreement controls. *See, e.g., Reed v. Royal Caribbean Cruises Ltd.*, 2021 WL 4307048 at *9 (S.D. Fla. 2021). In *Reed*, there were two potentially conflicting forum selection clauses. However, RCCL's Ticket Contract provided that "in the event of any conflict between any such other brochure or website materials and this Ticket Contract, this Ticket Contract shall prevail." *Id.* Thus, the court utilized the forum selection clause contained in the Ticket Contract. Here, the district court erred by enforcing the conflicting arbitration provision.

### III. <u>THE DISTRICT COURT ERRED BY RULING THAT THE NON-SIGNATORIES CAN APPLY EQUITABLE ESTOPPEL BECAUSE THE PLAINTIFF'S CLAIMS AGAINST THE NON-SIGNATORY PARTIES ARE BASED UPON THE BORROWED SERVANT DOCTRINE, NOT THE SEAFARER'S EMPLOYMENT CONTRACT AND THE PLAINTIFF'S CLAIMS DO NOT ALLEGE THE TYPE OF CONCERTED CONDUCT NECESSARY FOR EQUITABLE ESTOPPEL</u>

### A. The District Court Ignored that Chemaly's Claims Are Based Upon the Borrowed Servant Doctrine, Not the Seafarer's Agreement, Which Precludes Application of Equitable Estoppel

The "Seafarer Employment Agreement and Statement of Terms and Conditions" provides that Chemaly's employer is R. Operations Ltd. (DE 5-1). None of the other Defendants are signatories to the Seafarer Employment Agreement and Statement of Terms and Conditions.

Equitable estoppel allows a non-party to enforce the provisions of a contract against a signatory in two circumstances. *Usme v. CMI Leisure Management Inc.*, 106 F.4th 1079, 1087 (11th Cir. 2024). The first is when the signatory to the contract relies on the terms of the contract to assert his or her claims against the non-party. And the second is when the signatory raises allegations of interdependent and *concerted misconduct* by both the non-party and one or more of the signatories to the contract. *Id.* at 1087-1088. (citing *Bahamas Sales Associate, LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012). The district court expressly relied upon the concerted misconduct exception.

Here, as in *Usme*, Chemaly does not "rely on [his] employment contracts to assert [his] Jones Act and general maritime claims. Instead, [Chemaly] alleges that – contrary to what the agreements indicate – [he is an] employee of" Lampert and Gold under the borrowed servant doctrine. *Usme*, 106 F.4th at 1089. *See also,*

*Cortes v. Baltimore Insular Line, Inc.*, 287 U.S. 367, 371 (1932) ("Because maintenance and cure 'is imposed by the law itself . . . [that] no agreement is competent to *abrogate* [it]'"); *Reed v. Steamship Yaka*, 373 U.S. 410, 414-15 (1963) ("We pointed out several times in the *Sieracki* case, which has been consistently followed since, the shipowner's obligation of seaworthiness cannot be shifted about, limited, or escaped by contracts or by absence of contracts and that the shipowner's obligation is rooted, not in contracts, but in the hazards of the work.").

Here, the Plaintiff's claims do not attempt to hold the non-signatory to the terms of the contract. The Plaintiff's claims allege statutory and general maritime claims. Although the district court noted that the contract contains certain provisions concerning medical care, those provisions were not relied upon by the Plaintiff for his claims nor cited in his Complaint.

As this Court noted in *Usme*, "[t]he borrowed servant doctrine is the functional rule that places the risk of a worker's injury on his actual rather than his nominal employer," and "permits the injured worker to recover from the company that was actually directing his work." (quoting *Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 178 (5th Cir. Unit A 1981). The Jones Act "does not require proof of a written employment agreement." *Usme*, 106 F.4th at 1090 (quoting *Pennington v. Pac. Coast Transp. Co.*, 419 F.2d 122, 124 (5th Cir. 1969). Here, as in *Usme*:

> The short of the matter is that the requisite Jones Act employment relationship under the borrowed servant doctrine may exist without a

written contractual agreement.  As such, the claims here do not necessarily arise out of the crewmembers' employment agreements with the non-party entities.  When claims are asserted against entities that are not parties to an employment agreement, those claims generally will not "actually depend" on the agreement.

*Usme*, 106 F.4th at 1090 (citing *Byers*, 701 F.3d at 1343).

Then, in a footnote, *Usme* observed that "when seamen bring Jones Act claims under the borrowed servant doctrine against entities that are not parties to their employment agreement, as here, the employment agreement does not necessarily form the basis of their claims.  This is particularly so when there are no factual findings by the district court with respect to the borrowed servant theory."  *Id*. n. 9. Here, just as in *Usme*, the district court made no factual findings with respect to Chemaly's borrowed servant theory of liability.

The first problem with the district court's equitable estoppel ruling is that Chemaly did not allege that he is entitled to Jones Act benefits because of his contract with R. Operations.  The Plaintiff's complaint does not refer to that contract. Instead, Chemaly alleged he could recover under the Jones Act against Lampert and Gold via the borrowed servant doctrine, which imposes *tort* liability upon the non-signatories because of the control they exercised over the performance of the seamen's job duties.

As explained in *Usme,* the pre-*Bonner* opinion of *Guidry v. South Louisiana Contractors, Inc.,*614 F.2d 447 (5th Cir. 1980) holds:

a third person who borrows a worker may become his employer *if the borrowing employer assumes enough control over the worker*. However, even if a seaman is deemed to be a borrowed servant of one employer, this does not automatically mean that he ceases to be his immediate employer's servant for Jones Act purposes. *It may also be possible for a seaman to have more than one Jones Act employer.*

*Id.* at 454. *See also Sarmiento Lopez v. CMI Leisure Management, Inc.*, 565 F.Supp.3d 1271 (S.D. Fla. 2021).

*Sarmiento* properly held that the Jones Act claim was based upon the defendant having "assum[ed] control over [plaintiff's] employment," *id.* at 1276, and as such, "a formal employment contract was [neither] necessary or central to Plaintiff's claims." *Id.* at 1277. The claim against the other CMI entity was "based on general maritime law . . . [which] does not require an employment relationship at all." 565 F.Supp.3d at 1277. The same is true of the similar claims against Lampert and Gold. *See also Hurtado v. Balerno Int'l Ltd.*, 2019 WL 8160701 (S.D. Fla. 2019). Below, the district court – the same district court Judge who decided *Sarmiento* – distinguished *Sarmiento* on procedural grounds, while ignoring its actual holding.

The district court mistakenly ruled that Plaintiff is seeking benefits under the employment agreement, as his claims are independent of any contract and are instead based upon the *statutory* provisions of the Jones Act and general maritime law, which *require no contract, much less a written one*. *Usme.*

Nor did Mr. Chemaly refer to the Seafarer's Agreement in his failure to

provide maintenance and cure (Count III) and failure to treat (Count IV) claims. Count III for failure to provide maintenance and cure was premised entirely upon general maritime law. (DE 1, para. 46).

Similarly, in *Pineda v. Oceania Cruises, Inc.*, 283 F.Supp.3d 1307 (S.D. Fla. 2017), the court held the doctrine of equitable estoppel inapplicable to allow a concessionaire, which actually controlled the plaintiff cabin steward's work and had been sued under the borrowed servant doctrine, to raise an arbitration clause in an employment contract with a nominal paper employer, because the suit was not based upon a breach of the contract. *See also, Cappello v. Carnival Corp.*, 2012 WL 3291844 (S.D. Fla. 2012).

*Escobal v Celebration Cruise Operator Inc.*, 482 Fed.Appx. 475 (11th Cir. 2012), upon which the district court relied, conflicts with *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009). However, because *Cooper* is a published opinion, it is binding on this Court, and to the extent that *Escobal's* ruling concerning the "inextricably intertwined" nature of the claims conflicts with *Cooper*, it is a violation of the Eleventh Circuit's prior panel precedent rule. Here, the Plaintiff's Complaint does not allege concerted misconduct. Rather, it alleges misconduct, and further alleges that the misconduct was **either** engaged in by the Cayman Islands companies, **or** by Lampert and Gold as Mr. Chemaly's borrowed employers. *See also,* Fed.R.Civ.P. 8(d)(2) ("Permitting a party to plead 'two or

more statements of a claim . . . alternatively or hypothetically, either in a single count . . . or separate ones' and (3) allowing '[a] party [to] state as many separate claims . . . as it has, regardless of consistency.'").

### B. Chemaly's Claims Do Not Allege Concerted Misconduct

The second exception applies only where the Plaintiff's Complaint raises allegations of substantially interdependent and *concerted* misconduct by both a non-signatory and one or more of the signatories to the contract. *MS Dealer Service Corp. v Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (citing *Boyd v. Homes of Legend, Inc.*, 981 F.Supp. 1423, 1433 (M.D. Ala. 1997). The district court erroneously determined that Plaintiff's Complaint alleged concerted misconduct amongst and between signatory R. Operations and non-signatories Lampert and Fountainhead Marine (DE 36, p. 30-31), going so far as to suggest that the Plaintiff's claims are "one and the same." (DE 36, p. 31).

However, Plaintiff's Complaint alleges that he was employed by Defendant, R. Operations, or "in the alternative" by Fountainhead or "in the alternative" by Lampert. (DE 1-2, paras. 35-37). The Complaint does not allege concerted actions; it alleges alternative actions. Furthermore, as in *Usme,* Defendants, R. Operations and Fountainhead, are alleged to be mere paper companies that have no base of operations in the Cayman Islands. (DE 1-2, paras. 6 and 9).

The district court erroneously found that Plaintiff's claims in Count I for Jones

Act negligence, Count III for failure to provide maintenance and cure, and Count IV for failure to treat "rely in part on R. Operations' failure to uphold its contractual duties." (DE 36, p. 32). Respectfully, that is simply not the case. Again, there is no reference to the contract in the Complaint and the claims alleged in the Complaint arise out of either a statutory duty (Jones Act and failure to treat claims) or general maritime law based simply upon seaman status. Nowhere in the Complaint does Mr. Chemaly allege a breach of the contract, or allege that his claims sound in contract or that the duties breached arose pursuant to a contract.

## CONCLUSION

The initial question of arbitrability and the determination of null and void defenses are determined applying domestic US law, statutory and judicial, and that Jones Act cases are not a subject matter capable of settlement by arbitration and any contract provision which purports to so require is void. For the additional reasons set forth above, the Appellant, Byron Chemaly, respectfully requests that this Court reverse and remand to the district court to remand all of his claims back to state court.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 13,995 words.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on August 22, 2024 this document was

electronically filed with the Clerk of the Court using CM/ECF and served by email

via Notice of Electronic transmission on all counsel on the attached Service List.

**PHILIP D. PARRISH, P.A.**
*Counsel for Appellant/Cross-Appellee*
7301 SW 57th Court, Suite 430
Miami, Florida 33143
Tel: 305-670-5550/Fax: 305-670-5552
Email: phil@parrishappeals.com
    betty@parrishappeals.com

By:___*/s/ Philip D. Parrish*_____
        Philip D. Parrish
        Florida Bar No. 0541877

# SERVICE LIST

Michael F. Guilford, Esq.
Michael F. Guilford, P.A.
44 W. Flagler Street
Suite 750, Courthouse Tower
Miami, FL   33130
Tel. 305-539-1999
mfguilford@crewcounsel.com
*Counsel for Appellant/Cross-Appellee*

Philip D. Parrish, Esq.
Philip D. Parrish, P.A.
7301 SW 57th Court, Suite 430
Miami, FL   33143
Tel. 305-670-5550
Fax 305-670-5552
phil@parrishappeals.com
betty@parrishappeals.com
*Counsel for Appellant/Cross-Appellee*

Charles S. Davant, Esq.
csd@davantlaw.com
Aaron M. Dmiszewicki, Esq.
amd@davantlaw.com
Davant Law, P.A.
12 Southeast 7th Street
Suite 601
Ft. Lauderdale, FL   33301
Tel. 954-414-0400
*Counsel for Appellees/Cross-Appellants*